Good morning and may it please the court. My name is Maria Polsetti. I'm with the Federal Defenders. I'm representing Mr. Victor Lopez. Ms. Polsetti, maybe you can start out by helping me. Is there any case out there which takes Doyle and extends it beyond the context of either post-arrest statements or post-arrest silence in the confines of a custodial setting or post-arrest silence in the circumstances other than police custody or to a law enforcement officer? Absolutely, and may I reserve three minutes for rebuttal? Sure. Yes, this court's precedent is clear that Doyle error extends to questions that go any time up until the time of trial. To whom? Maybe you can find for me what you mean by Doyle error. Okay. So I think what I'll do is give you some examples of questions that this court has held violate the Doyle rule. So in Doyle itself, one of the questions that violated due process was, as a matter of fact, you never told anyone you had been set up until today. In Shannon, one of the questions that violated due process was, you waited until you took the stand and then you told us about Williams, right? Williams was one of the people in Defendant's Exculpatory Testimony. In Haseen, one of the questions was, but you kept it to yourself until you came into a court of law today. All of these are phrased in a way that would encompass statements to law enforcement. So is it or is it not the case that the Doyle rule extends only to questions about statements made to law enforcement? Let me try this another way. Since Doyle creates prophylactic rights to protect Miranda's own prophylactic rights, that's how Doyle originates, right? Should Doyle be limited to the kinds of cases where Miranda would apply? And if that's so, does that mean you can ask questions about who did you talk to other than law enforcement? I don't think the court needs to reach that question, because there are clearly questions that encompass, did you talk to law enforcement about this exculpatory account? But back up, we'll get to that, but back up. For example, let's take Lopez's situation. I guess on the witness stand, what if the prosecutor asked him, and I assume he didn't live with his mother, let's assume he lived with his mother, if he were asked, did you tell your mother what happened when you got home that night, would that be a Doyle issue? I'm not sure if it would be. I think it likely would not be, but that's clearly not what happened. What about in this case the question, hey, did you call up Crystal and ask Crystal, did you tell Crystal about what happened last night? Did you tell Pagan what happened last night? Are those Doyle violations? I'm not sure, and I'm willing to concede that they may not be. However, those questions came after four questions that were, did you tell anyone about what happened? And it's those four questions, of course, that we're here today. And the government has, in fact, conceded that two of those questions are Doyle error. I would also look at the government's summation. Now, in summation, the government explained what inference they were asking the jury to draw. So at the conclusion of the section of the summation about Mr. Lopez's credibility, the government said, but he didn't fear for his freedom enough to do anything about it. Until today, he said nothing about this conduct to anybody who could make a difference. So they're clearly focusing the jury on his silence to anybody who could make a difference. In the context of the earlier question, the question was objected to and sustained, but nevertheless the prosecutor thought it was appropriate to bring it up and close an argument, and that was filing a complaint. He was asked, did you know how easy it is to file a complaint? Nothing in the record about how easy it is to file a complaint, but the prosecutor asked, did you know how easy it is to file a complaint? I didn't know how easy it is to file a complaint, Mr. Rizzi. I'm assuming that somebody with the four felony convictions may not feel, maybe I should go down to the police office, they'll let me in, you know, and I'll file a complaint against this officer. But that statement in the closing, shouldn't it be read in context of the complaint and not the Doyle issue? I don't think it's entirely clear whether the jury would draw the inference that that was a reference to his silence about his exculpatory account or his failure to file a police complaint. But it wasn't the only reference in closing arguments. There was another reference, an innocent man framed sitting in jail, and that's all he did until he took the stand yesterday. Compare all of this to the police officer's testimony. The officer's testimony simply makes more sense. Now, in Doyle. The defense counsel, who, just so you understand, it was not you. The defense counsel ended up with his own problems. But counsel never asked for a limiting instruction. What I read is it's, I mean, it jumped out at me that the burden of proof has been shifted. But no objection was made at sidebar or in open court, and Judge Thompson was not asked for a curative instruction about the burden of proof. At any time during the trial, as I see it. Correct. So since no objection was made and there was no request for a curative instruction,  The parties agree that we're on plain error review here, yes. And because it's on plain error review, help me with the standard here. The government, I think at page 16 of their brief, has laid out their view of how the standard review works. And citing the Renoso case, they say that the dispositive question is whether the defendant has shown that the error affected the outcome of the district court proceedings. That's your burden, right? It absolutely is. It's whether the error affected Mr. Lopez's substantial rights. In 2010, the Supreme Court in Marcus clarified that by saying it's a reasonable probability of a different outcome, which is, of course, a familiar standard to the court. Okay. So a reasonable probability of a different outcome. So stick with me here for a second. Here's a case where you've got one guy, multiple felony convictions. He's demonstrated to have attempted to suborn perjury. He has a story about going to see a gal on the 10th floor, no wait, apartment number 10 of a building, who he's been on a date with and is interested in, but he can't remember her last name. And in short he's a millennial human being. Yeah, yeah. And he claims to have written her a letter, which was returned undeliverable. That's what's all stacked up against him on his side, and the two police officers who he admits he's never laid eyes on before, and evidently there's nothing in the record to indicate they're out to get him and his claim that he planted the gun on him. So under those circumstances, even if we assume this is a Doyle violation, have you demonstrated that the outcome of the proceedings would be different? We have, yes, and I'm going to give you three reasons why. The first is that the evidence in the case was not overwhelming. The government has actually conceded that in their briefing. I'll discuss that. The second is that the government relied upon the Doyle error in summation, and this Court has never failed to reverse a Doyle error that was in both examination and summation. You mean the plain error review? Yeah, you've always cited it. You've given us harmless error cases on that, no plain error case, right? Correct. The only plain error case is Woods, which is non-presidential. This Court hasn't had a plain error Doyle case that resulted in a precedential decision. But I think plain error review is not an insurmountable standard, right? And a review of this Court's Doyle error cases compared with the facts here I think will show you the prejudice can be shown. So in Edwards, Judge McKee just this summer wrote an opinion saying, despite some evidence suggesting that Edwards' exculpatory story was not plausible, the error was still harmful and required reversal because the case hinges on credibility. Here, of course, the case hinges on credibility. Well, if that's going to be the case, if it hinges on credibility, that would just sort of overwhelm the plain error standard, wouldn't it? Because in many, many, many cases, if the defendant has taken the stand, it's going to hinge on credibility. So if the guy is impeached ten ways from Sunday with his prior felony convictions, his proven penchant for lying because he was attempting to suborn perjury, and what appears to be a patently implausible story about a dating woman whose last name he just couldn't remember, isn't it incumbent on us, don't we have to kind of weigh that impeachment evidence into balance and say, I don't think this is coming out different? Well, I think we have to look at what was happening in the trial. I agree, we have to look at exactly what was happening in the trial. There were two men stopped. Everyone agrees. Everyone who testified agreed that two men were detained by the police. There was a tussle with the other guy. The other guy got away and has never been identified. And then there's one gun found. I think two men, one gun is actually a pretty reasonable defense. I don't think this is the defense that you go to a jury and say, police officer. Two men, one gun, but it's the gun in your client's pocket, according to the cops. Right? That's a cop's testimony for sure, yes. Precisely, and we're in the zone, and I guess you're agreeing with me. I think that's good, because I think that's the law, that we can't help but actually do some assessing of the evidence ourself here in this context, what's credible and what isn't. Right. I mean, in the United States v. Davis, this case, well, I guess it was Virgin Islands, but this court looked at a case where the defense was that Goofy did it, that an unknown man who was never really identified named Goofy was the real shooter when there were three eyewitnesses to the shooting, none of whom had seen this extra man in the truck. And that was on plain error review. But still, it doesn't mean that this court can't look at that precedent as relevant to its consideration of the prejudice here. In both Shannon and Davis, the defendants were impeached with prior convictions, and Shannon had prior convictions for narcotics trafficking, which is what he was on trial for. Shannon also had a bunch of other problems, falsified logbooks, bad cell phone, et cetera. Harmless error review, right? Shannon was on a harmless error case. Yes. That just shifts the landscape dramatically for your client, doesn't it? It's the standard that we have to deal with, of course. Yes, I can't argue. So there's very little precedent on point. In Woods, which was the non-presidential case, the court wrote, essentially the jury was required to decide whether they believed Woods or the victim. The testimony was the victim, the defendant, and the arresting officer, so a similar sort of contest of credibility, and error was found in that case. The Ninth Circuit case also was a sexual assault. I believe it was sort of a he said, she said credibility contest, and the Ninth Circuit acknowledged that the evidence was strong against the defense but still found plain error. Can I ask you, since we're starting to wind down toward the end of your time,  and help me out with whether or not you would agree that the impeachment value that your client sought was functionally the same using the police report as it would have been had questioning been permitted on the basis of the transcript of the earlier hearing? I would argue that that is actually not clear from the record. The police report was not entered into evidence. I don't have it, and so I don't. The counsel thought they were functionally the same, wasn't it, because he relented. When Judge Thompson offered to let that in, he basically relented, and he actually used the words, they're the same, right? I'm not sure if he used the words, they're the same. But Judge Thompson clearly overruled his, clearly sustained the government's objection to his questioning, so he couldn't ask the question. She sustained the objection. Questions about the prior hearing? About the prior hearing. Well, that's true, but then after they said, well, I thought he said, well, the police report is fine because the statements in the police report are tantamount to the same thing. Am I wrong about that? You're making it look like you're puzzled. I'm honestly not sure about that. Okay, okay. So what I do know happened is he cross-examined Officer Martinez about some inconsistent statements in the police report, but not about this particular one we brought to the Court's attention. So I would assume it's not in there because he did actually cross-examine on the police report, but not on this particular point. And, of course, the question was, you know, who said, we're okay, we're leaving now, whether it was my client or the other man who my client testified he was not with. And that, of course, goes to my client's credibility because he testified he was not with the other man and therefore presumably wasn't culpable for the other man's activities. The record says that it was the other guy who said 10th, 14th Department. So the parole revocation transcript that was not permitted to be used on cross-examination says that Martinez couldn't remember which man said that, but Martinez testified in this trial that my client said it. So it would be a prior inconsistent statement with which to impeach. The government has argued that this isn't preserved. We've argued that the counsel's exchange of the colloquy was sufficient to preserve the issue. Let me direct your attention to page 205 of the appendix. Trial counsel says, I intend to ask him questions about what his testimony was, if they're different. The Court interrupts, where? Trial counsel. If they differed from his testimony here and I am entitled to go into, Judge, I certainly am entitled to go into his police report that he wrote on September 13, 2012. Well, I haven't said anything about that. Counsel, well, it's the same thing. He says no, it's not. Right. I mean, I don't think we know necessarily what counsel means by saying, well, it's the same thing, or whether questions. Given the antecedents, isn't he saying the police report is functionally the same as that prior testimony? If I can talk about that, you should let me talk about the testimony, too. It does seem to follow, however, since he wasn't permitted to go into it and since the witness wasn't confronted. I mean, the purpose of cross-examination is you confront a witness and you don't know what the witness's reaction might be. Well, he was confronted with his police report, right? For sure. Yes. I see my light is on. Should I sit down? I love the question. It's always a good bet. Yeah, it is a good bet. It's a smart bet. You saved some time, I believe, didn't you? Yes, I did. Then you may stand up again. Thank you. Maybe you could give a course in Newport advocacy where you teach attorneys who are arguing. When the red light comes on, the appropriate response is always to ask, should I sit down? That's good. That is good. I apologize, Your Honor. No. Give your CLE credits for that. Good morning. Good morning. May it please the Court, I'm Assistant United States Attorney Stephen G. Sanders. On behalf of the United States, the appellee seated at the council table are AUSA Sarah Marin and AUSA John Romenko. May it please the Court, we're here on plain error review on a question raised by the defense whether the questions asked on cross-examination and the arguments made in summation amount to a plain Doyle violation. What about when Ms. Posey said that you've conceded that two of the questions at least implicate Doyle. I'm saying implicate, which is a little bit different and a little softer than what you just said, but let's take it your way. At least two of the statements, two of the questions violate Doyle. Would you agree with that? I think they come very close to the Doyle line because of what, I mean, this is similar to what happened in Martinez. Anyone, the open-ended kind of question. Right. When you ask the question, you're assuming a risk, right, that you're going to get a response that intrudes into this area. Now, I think the questions that Charlie USA asked immediately after that, about the day after the arrest, homing in on who the other people he told were, suggests that the goal here wasn't to. Do you want us to go there, though? Look, your opposing counsel has said you don't have to reach the question of whether Doyle is a protection against the government inquiring about silence as it respects non-law enforcement people. Do you agree with her or not agree with her that that's an issue we don't have to get to in this case? I don't know if you have to reach it at step one, but I think it's very relevant to the question of prejudice at step three, and here's why. If those are proper questions, and I believe they are, then the legitimate damage to the defendant's credibility from the steps he didn't take to corroborate his story, right, are relevant for the jury to consider, and if that's true, then it takes the sting out of any Doyle violation. The jury was not blown away by the absence of the steps he took to corroborate his story. The questions they came back with, as I'm reading the briefs, I'm thinking to myself, these are really darn good questions. There may or may not have been a surveillance camera up there, but if there wasn't one, the officer could have been asked whether there wasn't any surveillance camera, and that would explain the absence of surveillance photos to show what happened. How hard would it have been, is there an apartment number 10 or isn't there? If there is, who lives there? If it isn't, then you got them on that lie. They asked some very, very good questions. Someone I was asking myself about the trial of this case was an abomination. Not only do you have bumping against the Doyle line in a way which doesn't give the government any credit, but the total absence of any investigation, the absence of anything to prove the government's case except throw the Doyle into the thing, shift the burden of proof to the defendant, and highlight to the jury the fact that he hasn't proved anything, he doesn't have any witnesses here. Unfortunately, he had a defense counsel who slept through trial apparently or was waited by his own indictment and didn't bother to object to anything. Let me take one step back and say certainly no one's more upset about the fact that we came close to the Doyle line here than I am because I am, as a supervisor in my office, just as responsible as everybody else for appropriate training, and I think this was a failure of training, and I'm here to tell you it's not going to happen again. I'm very grateful to hear that. Likewise. Thank you, Mr. Sanders. Having dealt with Doyle cases more than we would like in the recent past, it's distressing to see it come up yet again. So I'm delighted to hear you say that there's going to be some training because I'm sure you have fine assistant U.S. attorneys who are thoughtfully attempting to do their job. They need to know they don't get to ask questions about your silence, and in fact I'd highly recommend that you not encourage us to go up and answer the question of whether Doyle is violated by asking about silence with respect to others besides law enforcement. I just don't see where that's a good bet for the government to get into that. So I'm very happy to hear that there's going to be training on that. That's good news. But assuming that we were to say there's a Doyle violation here and the way it was framed, how do we address the prejudice issue when you've got jury questions that indicate they're wrestling with some of this stuff, that maybe it's coming down to a question about which side they're believing in and the problem with the cross-examination and the summation highlighting silence might have played into it? Well, the test that was articulated is a reasonable probability of a different outcome, and as the Court has already expressed in my adversary's argument, there were legitimate ways that the defendant's credibility was damaged. And so the question is, is this, assuming it's error that's plain, is this additional but illegitimate effort the straw that broke the camel's back? And I just want to take a step back, and I'll answer that question. I don't believe, Your Honor, that there's a burden shift issue in this case. It hasn't been raised in the... It wasn't raised. It wasn't raised. And I think that in fairness to the prosecutor who conducted the summation, I think we said the defendant has no burden to put on a defense. But once he does, you're allowed to, as Walter says, poke holes in it and highlight them. And I think that goes to some of the questions the jury asked. That's a good point. Why wasn't Crystal here? I don't know if they're asking why we didn't call her. And actually, I don't think, had they taken that approach, I don't think if that had been all that was said, we probably wouldn't be here, right? But that isn't all that's said. Things that are said include specific highlighting of stuff that is a comment on silence. You know, you look at pages 374 and 375, and there are statements which specifically highlight that Mr. Lopez didn't come up with his explanation until he's sitting in the courtroom. I mean, it's comments on silence, right? Well, it's comment on silence about what's clear is that the rough treatment he suffered at the hands of the police. And that's this conduct. Now, this court may conclude that that's inextricably linked with also the failure to come forward with his story. But I'd say in response to that, the argument by the defense counsel in summation, his retort, was the futility argument, which I think has some resonance. What's he going to do? You know, in the Cora Doyle case where you're sitting in jail or you're being questioned, you've been advised of your Miranda rights, and you have a piece of information that if disclosed could blow the case wide open and set you free, and you don't disclose it, that's where a Doyle violation hurts the most, right? It stings the defendant because the argument is why would you have languished in jail so long? You know, when you say it's just about rough treatment, it's true that the prosecutor comments on rough treatment. But she goes on to say he never reported the behavior to the police, presumably that includes the planting of the gun, to anyone at the jail, to the prosecutor's office, to his congressman. He testified he told a few friends, but he couldn't tell us who they were. So it looks like she's – it sure looks to me like it's talking about the frame-up and that he didn't tell anybody, including the police, anyone at the jail, the prosecutor's office. That just looks like hanging a bell on the Doyle clock. I didn't interpret the other way until you just said you couldn't. And that's my fault for not writing it more clearly in my brief. Even if you could roll the rough behavior into it, a reasonable interpretation of that is, look, he didn't tell anybody he was framed. I mean, isn't that a reasonable interpretation of that language? Well, I think Ms. Pozzetti said in her argument that it's unclear if it was addressing this point. And if that's true, then the plainness part of it, we're here on plain error, there is that component. And if there's some ambiguity there, and I think there is, then that's a harder hurdle to overcome. But I want to get back to your question, Your Honor, because you asked me this. I'm thinking more about what you said about the burden of proof. I thought it was a very helpful response. But, you know, in retrospect, I'm not so sure it is because that's true. Once he takes the stand, they can assess his case. But that doesn't shift the burden to the government. And it still seems to me that those statements are problematic. Well, but if they are, then Brecht couldn't have come out the way it did, or at least the statements in Brecht. And I know we all think about Brecht as a decision about what's the standard of review on habeas corpus when there's a dual violation. But before the court got to that, the Supreme Court, they addressed whether there was a dual violation. And they said pretty clearly that the questions to the defendant about the time before he received Miranda warnings. I'm not talking about then. I'm talking about the shift in the burden, which is not really here. But that's what I'm talking about. The questions about that were something to the effect of, you know, those were highly poetic because if this were true, that the shooting was an accident, the defendant would have had every reason to want to tell law enforcement, to preserve evidence that helped establish the credibility of his story. And so I say that only by analogy here. The questions about did you call Crystal, did you call Pagan, not to say did you tell them, did he tell you this, but to ask for those small bits of collaboration that you always see in a case that help credibility, where you could call Pagan and say, did you drive Mr. Lopez to that apartment that night? Yes, I did. I disagree with that. But, again, the thing that bothers me, and I do hold the government to a higher standard, and I think that's appropriate having never been a federal prosecutor myself, when you have a case that could be such a lock in terms of surveillance photos, apartment 10, to ignore all that really strong stuff where you don't have to play games and get cute with Doral or anything or suggest to the jury that this guy is not proving his innocence, and then go to this kind of questioning and this kind of closing the exam, whether or not you win. We haven't discussed this case, and I think it is a very close call. Even if you would have won, I'm not suggesting that you will win or lose. It's really offensive, really offensive. On behalf of the government, I apologize, Your Honor. On behalf of my office, like I said, this is a failure of training. It will not happen again, and I and my colleagues will see to that. Well, that's appreciated. Now, let me address the prejudice question here, because Ms. Pulsetti does cite in her brief and has talked about today cases where the error is preserved. The burden on the government, as I wrote in my brief, is to disprove prejudice beyond a reasonable doubt, which means if there's any possibility that the error affected the outcome, the defendant wins. And in a case where there's a swearing contest between a government witness and a defense witness, if there's any doubt about, and the case turns on credibility, the government is almost never going to be able to surmount that burden. In fact, if this were a preserved claim, I wouldn't be here arguing that the error is harmless beyond a reasonable doubt. But this case is here under Rule 52B. And, in fact, there are cases that have found even under Rule 52A the error harmless matters about the Ross case, which I cited in my brief on page 21. It's from the Ninth Circuit, but that's the case that's very similar. The defendant's story was impeached, and the Ninth Circuit went out of its way to point out that the defendant's credibility was impeached in other ways, and this couldn't have been the thing that made the difference. The evidence, I believe, was stronger in that case. But for Rule 52B, as I cited in the O'Brien case in the First Circuit, right, it's enough for us to show that the outcome quite likely would have been the same. I think we've met that burden precisely because of the other ways in which the defendant's credibility was impeached here. Four convictions, his interest in the outcome, right, the holes in his story about couldn't remember people's last name, having sent a letter that came back, all those things come together to say that if this is a dual relation that's claimed, it's not what the straw that broke the camel's back. Now, I'd also briefly like to turn to Edwards. This was when he brought up the Edwards case, and I just want to point out a distinguishing fact in that besides the fact that that was a preserved claim, the government in that case actually used the defendant's silence as substantive evidence of guilt, not just for impeachment. And so it's sort of a double whammy, and I think distinguishes this case. That didn't happen here. I'd like to turn to the Confrontation Clause issue, unless the Court has any other questions for me. On the Doyle issue, we do argue, and I think correctly, that this error was not properly preserved. And for this simple reason, the government wasn't objecting to the use of a prior hearing for impeachment purposes. The government was objecting that the defendant wasn't properly laying a foundation to do that. And that sidebar, defense counsel didn't articulate that that's what he was trying to do. Well, it wasn't an elegantly presented position. That's a fact. But how much of a burden is on defense counsel when this is a fine district judge, great district court judge, lots of experience, but she was, he would get like three words out, she was in it. He could barely open his mouth to say, you can read in the cold transcript, you can see him trying to make the point, Judge, he's talking about these are the same events that he testified about in this earlier hearing. He can never get that fully on the table. I mean, how hard do we have to be on the defense counsel who just can't make the record because he keeps getting cut off? Well, even if he's getting cut off, all he had to do, after Judge Thompson said, move in another direction, is either go back and then lay a proper foundation by saying, did you testify at a hearing on such and such a date? Oh, my gosh. Can you imagine what would have happened to him if he'd gone back and started on the same approach after she just said to him, move in another direction? That was never clear to me that the defense counsel articulated he was asking about a prior hearing. But he was saying, right, he was saying, did you testify previously in this case? I see my red lights on. I may have finished this morning. If he had gone back and asked the same questions the same way, yes, there would have been an objection. But if he had just said, did you testify previously, meaning on this date, and started to slice the baloney thin to lay the foundation, there would have been no problem. Well, we'll never know that. But given the way that was rolling, I'm a little more doubtful than you are, Mr. Sanders, that there wouldn't have been an objection. But that's neither here nor there. I guess if we get to the point of was he in the same place in the end with the police report, is that right? He plainly was. And the reason we know that, the only inconsistency was the fact that he used the word they, and he did it both at the parole hearing and in the police report to attribute these statements. And then at the trial, the officer moved to the specific, attributing one to one to Mr. Lopez, attributing another to the other defendant. I don't know if he deemed as being very specific, given the concerns the jury apparently already had about the officers. What's the concerns? I guess you could say that, the concerns about credibility. They clearly were not willing to accept the case and decided that based solely, initially, based solely upon what the police officer says it is, Lopez says that we're going with this because the police officer said it. That wasn't what this jury's mindset was at all. But even if true, he had the full and fair opportunity to cross that is guaranteed under the Sixth Amendment because he was allowed to pursue this line of impeachment and to impeach in other numerous ways and this couldn't possibly have affected the outcome. If there are no more questions, we'd ask you to affirm the judgment. Okay, Mr. DeSantis, thank you very much. Thank you. Ms. Poseny, what was the agreement that we made? Did you not reserve time? Did you have some agreement? She did. She did. She did reserve three minutes, as I recall. Yes, you're correct, Your Honor. I'd like to start off by talking a little bit about the police complaint issue. I think Judge Jordan's questions were quite helpful. And when we were looking at the transcript and saying, was this part of the argument about the police failure file, police report, or about the comment on silence directly, I would not argue that the argument about Mr. Lopez's failure to file a police report doesn't implicate Doyle. Actually, I think that comes pretty close to the line because, as Judge Jordan points out, a police complaint is that you disagree with the police's account of your arrest. So I think that does come quite close to the line and may, in fact, implicate Doyle. My opponent references Brecht, and I think that case is interesting for our purposes. But, you know, the argument the government is making here, that there is some sort of accumulation when looking at prejudice between, in Brecht, it was questions about pre-Miranda silence, which are permissible under Doyle, and post-Miranda silence, which is not permissible. That is, of course, not the case here. Now, the government, I think, is trying to accumulate questions about silence to anyone and questions about silence to Mr. Lopez's friends, but that's all post-Miranda silence, so I don't think it comes under that whole accumulation rubric. And you still take the position, do you not, that to resolve this case, we don't need to get to that question, right? That is, law enforcement versus non-law enforcement personnel as the recipients of comments from the defendant. I agree you don't need to resolve it, but I perceive the government trying to argue that that's part of their prejudice analysis rather than part of their straight-up was there an error analysis, which is why I wanted to bring it up. Right, and I guess what I'm asking you is, even in light of what the government says, your position hasn't changed, has it, that we don't need to get there? Correct, yes. In Edwards, which both sides have discussed, I would note that there was actually a curative instruction after the comment on silence in the summation, but this Court still found that it was not a harmless error, so obviously there was no curative instruction in this case. With regard to Issue 2, I think we can't forget that Issue 2 dovetails with Issue 1, so Mr. Lopez was unconstitutionally impeached during his own cross-examination and then was prevented from impeaching Officer Martinez with a prior inconsistent statement, and those two, of course, go hand-in-hand to damage the defense. Let's assume for the sake of discussion that we thought the Confrontation Clause question was properly preserved, and that's an issue we know that's in dispute, but assuming it were properly preserved, do you have anything to add in light of what the government said in response to what I take to be their argument that it's harmless? He got to use everything he could have gotten in the way of impeachment, he got with the police report. I understand that's their position. However, obviously this question that we've raised, that Officer Martinez was not impeached with that question, and it was brought up in the government's summation, or either the summation or the closing. Well, that's what I'm trying to get at. What can you point at? What can you point to to say this is what could have been asked on the basis of the hearing and wasn't that the police report didn't have the same foundation for that question? In other words, can you give us a specific of what could have been done with the hearing that wasn't able to have been done with the police report? My example is still the question about did Officer Martinez change his mind about whether he recalled it was my client or whether he didn't recall which person it was who said we're good, we're leaving. Previously he testified he didn't recall at trial, he testified he did recall. That's the statement we're relying upon, and the government in rebuttal did actually remind the jury of that point. They said that Mr. Lopez said he resisted. He said we're good, we're leaving. So it was important enough for the government to mention in their rebuttal, Appendix 40809, it was clearly a point that they thought made some difference to the outcome of the case. The Supreme Court in Doyle described the rule they were setting forth as due process plus, and I quote, it would be fundamentally unfair and a violation of, a deprivation of due process to allow an arrested person's silence to be used to impeach an explanation subsequently offered at trial. That's the same fundamental unfairness that infected Mr. Lopez's trial. This Court is empowered to notice the error and vacate the conviction. Thank you, Ms. Fisayo. All the very points you piled up when your light came on during the initial presentation, you just squandered them by repeating everything in your brief, repeating everything that was in your initial argument after your red light came on. But aside from that, it was an excellent argument. I'm not saying it was either or. I don't think I've had the pleasure of having you perform here before. It was an excellent, very thoughtful, and very engaging presentation. Mr. Samuelson, under different circumstances, I hope you come back to argue again. I really appreciate your candor and your response to this. It was very, very helpful, and hopefully things will improve and go from there. Thank you. Thank you. Another brief break, and then we'll conclude.